BETH CREIGHTON, OSB #972440
E-mail: *beth@civilrightspdx.com*
KRISTIN R. BELL, OSB #235024
E-mail: *kristin@civilrightspdx.com*
CREIGHTON & ROSE, PC
300 Strowbridge Building
735 SW First Avenue
Portland, Oregon  97204-3316
Phone:   (503) 221-1792
Fax:      (503) 223-1516

Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **NANCY BRYANT,** | Civil Case No. 6:18-cv-01553-AA |
| Plaintiff, | |
| vs. | **PLAINTIFF'S TRIAL MEMORANDUM** |
| **CITY OF TOLEDO, CRAIG MARTIN,** in his individual capacity, and **BILLIE JO SMITH**, in her individual capacity, | |
| Defendants. | |

## I.  INTRODUCTION

The scope of this trial was narrowed as a result of the rulings by the court's previous opinions on summary judgement, which establish the law of the case.  The total expected length of this trial is 5 days.

CREIGHTON & ROSE, PC

ATTORNEYS AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

## II. FACTS

The evidence at trial will show the following.[1] Defendant City of Toledo ("Toledo") is a municipal organization existing under the laws of the State of Oregon. Defendant Craig Martin ("Martin") was previously employed as the City Manager for the City of Toledo. Defendant Billie Jo Smith ("Smith") is the former Mayor of the City of Toledo. Plaintiff Nancy Bryant ("Bryant") was employed by the City of Toledo for thirteen (13) years before Toledo and Martin terminated her in 2017. At the time that Craig Martin arrived at the City of Toledo to serve as the Interim City Manager, Nancy Bryant had been City Recorder for 7 years.

Craig Martin came to the City of Toledo from Sweet Home, where the City was accused of discriminating against Timothy Piety, an African American employee of the City of Sweet Home. (Mr. Piety alleged he was called the n-word, he experienced threats of violence, racist graffiti in the park, and the killing of his family pet.) Craig Martin terminated Mr. Piety after Mr. Piety made race discrimination complaints against the City. Craig Martin involuntarily retired from the City of Sweet Home and received a severance package in April of 2016. The Toledo City Council members responsible for hiring Craig Martin either did not know or did not care about this history and hired him as the City of Toledo's interim City Manager in August of 2016 to serve through May 17, 2017. There had been a high turnover rate with the City managers before the Council hired Martin.

Martin became the permanent City Manager in January 2017, then acquired the authority to terminate employees without City Council approval. During Nancy Bryant's 13-year tenure

---

[1] Plaintiff reserves the right to modify the evidence presented at trial dependent upon the court's pre-trial rulings.

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

with the City, she worked under the supervision of 6 City Managers. All of the Department heads reported directly to the City Manager.

In February 2017, Melodi McGee, the Assistant City Recorder, who loved her job, resigned because of Craig Martin. Martin was aggressive, intense, and negative all the time. He was rude and demeaning. McGee described Martin getting angry and raising his voice quite often, throwing papers aggressively when he was angry. McGee observed that he did not treat Nancy Bryant in a respectful manner, nor did he treat her like she was management. She described him as critical about everything Nancy Bryant and she did. McGee states that Martin talked down to her and treated her as if she were stupid, even though she had a college degree. From her observations, she and Nancy Bryant were treated in a sub-par manner by Craig Martin, but he was more condescending towards Nancy Bryant. When Nancy Bryant would approach him, he would dismiss her or leave. Martin also made back-handed comments about Polly Chavarria, the finance director. McGee did not see Nancy Bryant engage in any behavior that contributed to the negativity in the office. Bryant merely held Martin accountable for what he was doing and called him out on his inappropriate behavior. She is assertive and stood up for employees and against things she did not agree with. If Craig Martin was making a decision that negatively affected the community, Nancy Bryant would voice her opinion about it. She was never rude nor unprofessional towards Craig Martin. She was always willing to help and do what was needed to act in the best interest of citizens of Toledo. Cindy Olivieri, the Assistant City Recorder after McGee's departure, never saw Bryant have any issues with any other city employee.

/ / /

CREIGHTON
& ROSE, PC | ATTORNEYS
AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

On the other hand, McGee observed that Craig Martin intentionally fostered negativity and did things to antagonize her and Bryant in the office. For example, during the summer festival, there was a woman who was not a good performer whom Bryant asked not to be placed outside her office window. Martin specifically gave his permission to allow her to perform right outside her office window. Craig Martin was abrasive and condescending to the female staff that worked closely with him, causing them to constantly walk on eggshells. McGee and Bryant did not see him treat male employees in a similar manner. He was disrespectful of women in the workplace and was caught staring at the Aquatics manager's breasts and putting his hand in his pocket and adjusting his private parts while standing over Polly Chavarria.

Those who worked closely with Craig Martin learned to deal with the constant negativity and frustrations he caused with humor. Often, he would implement changes that were illogical and made things more complicated than they needed to be without consideration of how things had been done for years. When he was questioned, he would brush aside the questioner and respond with an attitude of "You will do it my way, or be terminated." He ruled by dictatorship. Martin admits that his behavior and actions conveyed a more autocratic approach. McGee constantly felt her job was at risk from Martin telling her that her position was not needed.

After McGee left, Bryant approached Martin and gave him the option of transitioning the open position to one that served a support staff role for the City Manager. Bryant waited 3 weeks to post the position for him to think about it. At the end of the 3 weeks, Martin declined to change the position to be a support staff position for himself. Instead, he continued to treat

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

Bryant as his secretary[2], including demanding that she open his mail and manage his calendar[3]. At one point in the Spring of 2017, Bryant asked Martin if he treated other department heads the way he treated her (disrespectfully). He responded with "What makes you think you are a department head? What department are you the head of?"

Bryant attended the City department head meetings. In these meetings, she often expressed her opposition to Craig Martin's advocacy of spending the City's money. It is not within her job description of the City Recorder to decide how the City spends its money. For example, in December of 2017, Martin, an avid swimmer, and the coach of the girl's swim team, advocated to keep the city's pool open and create an independent entity, the Greater Toledo Pool Recreation District, to manage the pool, providing the entity with $165,000 from the City of Toledo, along with 3 years of free water and sewer services at a cost of $47,000 to the City. Bryant opposed this expenditure of tax payer money because she believed the City needed to prioritize necessary sewer repairs. (At the time, the City of Toledo was out of compliance with its National Pollutant Discharge Elimination System Waste Discharge (NPDES) permit due to spills caused by Toledo's outdated sewer system, and was receiving ongoing fines as a result.)

---

[2]"[i]n the United States before and during times material herein, secretarial jobs have been predominantly held by women, and the performance of secretarial work has been viewed as a female role." *Bureau of Labor & Indus. v. Roseburg,* 75 Or App 306, 313, 706 P2d 956, 961 (1985).

[3]"As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for [i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Price Waterhouse v. Hopkins*, 490 US 228, 251, 109 S Ct 1775, 1791, 104 LEd2d 268, 288 (1989)

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

Polly Chavarria, the City's Finance Director, and Will Ewing, the Fire Chief supported Bryant's position and were vocal about it.

Another expenditure of taxpayer funds that Bryant, Chavarria, and Ewing voiced opposition to was the City's purchase of the Columbia Bank Building. The intended use was to renovate it to use it for a new police station and provide space for emergency services to be in the same building. However, the cost to renovate the building was going to cost $3.1 million dollars, money that the City did not have. Martin was in favor of purchasing the building and convinced the Council to vote in favor of the purchase by representing that they could get grants to assist with the cost of the renovations. Some of the grants Martin was representing to the council that he could get were either non-existent or not applicable for the purpose for which the funds would be used. The Council approved the purchase based on Martin's representations. Martin never applied for the grants despite having clear direction in his performance evaluation from the Council to do so. The council kept asking Martin what was happening with the building and where were all the grants he said we could get, but they never got a clear answer.

Bryant attended all of the City Council meetings. Despite clear department head opposition to some of the actions and expenditures that Martin was in support of, Martin falsely represented to the Council that the department managers were in consensus on issues such as the creation of the Greater Toledo Pool District and the purchase of the Columbia Bank Building. Additionally, Martin falsely reported back to the department heads that the Council had directed him to instruct them to do things that the Council had not actually so directed. Bryant called him out on this behavior, asking him, "What meeting did the Council give that instruction?" When Martin perceived that staff was being critical of him or a position he was taking on an issue, he

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

became angry and lashed out. Even Councilman Bill Dalbey found him to be a petty and vindictive man, observing that he got angry and red-faced when Dalbey expressed an opposition about what he was doing.

Additionally, Martin seemed to have little regard of the City's policies or public records laws. In one Department Head meeting, he became angry with Chavarria because he thought she was criticizing him and ran out of the room after exclaiming: "You people are terrible. I hate you. I don't know why you attack me like this!" Another time, Martin blew up at Deborah Trustee, the Librarian, because she asked him a question about the pool transition.

In the Spring of 2017, Martin had a meeting with Bryant and Cindy Olivieri, the new Assistant City Recorder, to discuss the division of duties. In the meeting, after discussing a variety of tasks, Martin asked, "Who opens my mail?" Bryant responded with frustration. First, she was still being demeaned by Martin and treated in a manner that did not recognize that she was not his secretary; and secondly, Martin had the opportunity to hire a dedicated support staff person when the assistant recorder position was posted and declined to do so. Bryant complained that Martin seemed to want her to be his secretary, and he treated her like one.

A couple of days after this meeting, Bryant sent an email to Toledo Mayor Billie Jo Smith to tell her about her frustrating and controversial discussion with Craig Martin. She told Smith that there were personnel problems and invited her to discuss the problems. Additionally, she told her, "Craig has told me that if I talk to any of the City Council members, I must inform him of what was said. I believe that I am being discriminated against because of my gender, and he won't listen nor acknowledge my perception of how he is treating me."

/ / /

CREIGHTON & ROSE, PC   ATTORNEYS AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

Mayor Smith and Bryant met at the Dairy Queen at approximately 1:30 PM on May 17, 2017. Bryant told Smith that she believed Martin treated her differently because of her gender, and that he would never treat male department heads the way he was treating her. Smith invalided Bryant's concerns, telling her that he was not treating her the way he was based on her gender and that he needed someone to do that type of administrative support work for him. Smith did not feel she needed to investigate Bryant's complaint because it was not "an official complaint." After Bryant's conversation with Smith, Smith talked to Martin about concerns with the way things were going in City Hall. Smith spoke to Martin about Bryant's complaint about his performance as a City Manager.

Smith concluded that there were personnel issues with Martin because no one was talking to each other, and Bryant had her door closed whenever she went into the office, which was in contrast to how things were under the previous manager. (Bryant had not complained about the previous City Manager.) Martin suggested hiring Michelle Kennedy, a consultant, to talk to people and come up with recommendations about how things could work better. Martin also could have spoken to former City Manager Peet Wall to get tips about how to work best with these long-term employees (Martin had spoken to Wall prior to taking the City Manager position). Martin chose not to do so.

Michelle Kennedy performed a Management Review and made Findings and Recommendations, which she shared with the City on or around July 6, 2017. She made a number of recommendations for the City, including hiring outside, neutral sources to facilitate management, instituting a 360 evaluation for the management team including Martin, reviewing and updating the position descriptions,

CREIGHTON
& ROSE, PC    ATTORNEYS
AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

conducting a workload analysis, and re-organizing the requests for council action to include

options/alternatives for consideration, fiscal impact of the alternatives, and the staff's

recommendation. The recommendations also included that Martin should take a "leadership

assessment to gain more emotional intelligence on any 'blind-spots' that may be hindering the

development of successful relationships with direct reports and strengths that can be utilized to

improve interpersonal interactions." The report referred to "a few members of the executive

leadership team" who felt their expertise was not heard or solicited and had difficulties working

with Martin, citing he needs to be more open to opposing opinions.

Given his previous interactions with Chavarria, Bryant, and Ewing, it was not difficult for

Martin to determine who these "members of the executive leadership team" were. Martin did not

implement any of the recommendations in Kennedy's report, other than revising job descriptions

and checking in with staff and getting feedback on what was working and what was not working.

He did not attend any training to gain emotional intelligence as a result of Kennedy's

recommendations. He did not instruct the Department Heads to implement Kennedy's

recommendations. As a result of Kennedy's report, Martin was able to confirm the identity of

the individuals who were complaining about his mismanagement of the City and target them for

retaliation.

Martin began monitoring and documenting Nancy Bryant's activities in the workplace, in

an apparent attempt to find an excuse to terminate her. He asked other department heads to

secretly document interactions with her as well. Inapposite to the recommendations in the

Kennedy report, Martin decided (without staff input) to move his office and Cindy Olivieri's

office to the main floor of City Hall. He sent an email on 8/2/17 at 4:45 PM with the plan

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

attached, prior to leaving town for 5 days. Bryant sent an email in response when Martin was back in the office, addressing that he did not get the support of the employees at City Hall for his office move plan, and explaining that the proposed office locations of the Planning Secretary has been tried before, and the current location is better for the public and the employees. She also pointed out that the move of Olivieri would cause a disruption to the workflow and was not in the best interest of the agency.

After receiving the email from Bryant, Martin came out of his office red-faced and angry, confronting Olivieri about her stance on the office move. He admits that he may have raised his voice at her. She felt intimidated by his demeanor and the way he approached her. She felt like it was a direct attack and felt trapped with Martin in close proximity, with him pointing at her. She felt like her job was threatened because she voiced her opinion about the proposed move. Olivieri was pretty upset about the interaction and told Bryant. Olivieri drafted an accurate complaint and gave it to Bryant, who forwarded the complaint to the City Council. Bryant again reported her own experiences suffering insulting and abusive behavior from Martin. She stated, "I am trying to survive in a difficult workplace environment where conversations with the City Manager quickly become personal attacks" and that Martin's behavior makes the workplace feel "unsafe." She further stated, "I cannot go to the City Manager for fear of retaliation."

The City Council hired Jill Goldsmith of Workplace Solutions Northwest to investigate. Defendant Billie Jo Smith and Council member Terry Strom contacted Goldsmith, telling her that the City Recorder and some other staff members have been "attacking" the City Manager since he became the City Manager, "literally refusing to cooperate on anything he wants to do." They told Goldsmith that these staff members are resistant and insubordinate. They falsely

CREIGHTON
& ROSE, PC | ATTORNEYS
AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

relayed that Michelle Kennedy came in to consult and "felt everyone was willing to work on cooperating except for one person, except for the City Recorder," who they described as "a cancer." They represented that they were the contact people and they were empowered by the City Council. They also told Goldsmith about the complaints from the Assistant City Recorder and Bryant. Based on Goldsmith's notes of the conversation, the bulk of the conversation appears to be about the City Recorder and her "attacks" of the City Manager, rather than Bryant and Olivieri's Complaints.

During the investigation, Goldsmith was hostile and adversarial in her questioning, not at all independent or unbiased. Bryant and Chavarria, her main supporters, felt like they were the ones on trial. They felt as if there was a pre-determined outcome and Goldsmith was only there to justify it. Shortly after Goldsmith's interviews, Smith, without discussing it with the rest of the council, allowed Goldsmith to expand her investigation by looking at all of Nancy Bryant and Polly Chavarria's emails for a certain time period (not just the emails between them and Craig Martin). Smith told Martin to coordinate with the IT person to give Goldsmith access to the emails. IT talked to Goldsmith, who singled out Polly Chavarria, Nancy Bryant and Craig Martin for her email examination. Goldsmith received the emails on September 27, 2017. In her email fishing expedition, Goldsmith found what she was looking for an excuse to give to Martin to justify terminating Bryant. A close review of the relevant emails shows that Bryant neither initiated the emails nor participated in name-calling. This email fishing expedition also revealed an email that Bryant requested that IT remove Martin's access to the "recorder assist" file on the City's T-drive. Four days prior, Martin had accessed the wrong mission statement for the City by looking in archived records in the "recorder assist" file (the "recorder assist" file was mainly a

CREIGHTON
& ROSE, PC   ATTORNEYS
             AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

"working documents" file for the City Recorder and the Assistant City Recorder) and asked Bryant for the current mission statement. To prevent further confusion, Bryant ensured the current version of all documents in the "recorder assist" file were moved to a different location on the T-drive. There was nothing on the "recorder assist" drive that Martin needed to perform his job as City Manager, and if there was something he needed, Bryant was there to assist him.

Martin never confronted IT about removing his access to the "recorder assist" file, and did not complain about not having access to things he used to have access to. Goldsmith never asked Bryant about the emails or gave her the opportunity to explain. Goldsmith merely found something that confirmed Smith's bias that Bryant was working against Martin. Martin was unaware of the emails prior to Goldsmith's investigation. Even Councilman Bill Dalbey thought Goldsmith's report was a "hatchet job" used to target Bryant and that the investigation went "too far" looking at her emails to make her look as bad as possible.

On October 9, 2017, Goldsmith shared the draft of her report with Katie Kammer, an attorney from Toledo's insurance carrier, and spoke with her about the draft. Kammer wrote an email to Goldsmith suggesting changes to bolster her report. It is clear from her email that she was concerned about Bryant claiming "retaliation" and arguing that, because she and Chavarria were characterized as obstructionist and their complaints dismissed, it was based on their gender. In response to Kammer's directive, Goldsmith "reworked" the conclusions section and "emphasized the scope and purpose of the investigation," which was different in her report than her initial notes reflected.

On October 17, 2017 after the Goldsmith meeting with City Council, Smith wrote a letter to Olivieri telling her that, based on Goldsmith's findings, Martin "should have acted more

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

professionally when interacting with you" and told her the City would "facilitate a conversation between you and Mr. Martin to ensure that you have a professional and effective working relationship moving forward." Within 14 days of the conclusion of the investigation, Martin issued Bryant a Notice of Potential Termination. In the letter, he recounts Bryant's complaints, which included being treated as his secretary and that he was demeaning and rude to her. He characterizes her withdrawal and avoidance of his further disrespectful, demeaning behavior as "unwillingness to communicate at even the most rudimentary level." He falsely accused her of not permitting him access to personnel files and intentionally interfering with his ability to do his job. He describes her email communication with him as sarcastic, belittling, and unprofessional (although he provides no supporting documentation of this.) He brought up the emails curated by Goldsmith and accuses her of sending messages which include use of derogatory words to describe him (although she was not the one using such words), and making reference to his competency as a professional. Martin believed that Bryant (not Olivieri) was driving the complaint process against him.

Bryant provided a response on October 26, 2017. She responded to each and every point raised by Martin and indicated that she believed the notice of potential termination was in retaliation for her previous complaints. Less than a week later, Martin terminated Bryant's employment, ignoring all her responses to his accusations. In Martin's Notice of Termination, he sets forth his purported reasons for termination: "The investigation revealed that you have been engaging in disrespectful and unprofessional conduct directed towards me with coworkers," "the investigation further revealed you have been using your position as City Recorder and chief custodian of city records to interfere with my ability to do my job," and "your conduct toward

CREIGHTON
& ROSE, PC    ATTORNEYS
AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

other City workers as discovered during the investigation reflects a similar disregard for City

policy..." Each and every reason cited for terminating Bryant was one that resulted from

Goldsmith's investigation. Martin did not contemplate terminating Bryant until Goldsmith's

report. The reason Martin terminated Bryant is her email exchanges with Will Ewing

and Polly Chavarria. Chavarria and Ewing, who had not initiated complaints against Martin, were

not terminated in November 2017, even though they had actually written the emails that called

Martin derogatory names. They both were disciplined, instead. Martin's alleged reason for

treating them differently was because Bryant also "willfully and intentionally excluded me from

information that was critical for me to be able to perform my job as the city manager." Yet, he

admits that he had access to the position descriptions he needed and that the file was mostly

duplicative documents and drafts. He further admits that Bryant never refused to give him access

to anything he asked for, and he never asked to get information from the recorder assist file.

Chavarria, seeing the writing on the wall, chose to take an early retirement in December

of 2017, rather than wait for Martin to find a reason to terminate her. She described:

> "The stress and frustrations of the last year in this organization have taken a toll,
> both physically and mentally. This is a fractured organization and under the
> current leadership model, nothing is going to change. Employee morale is at an all
> time low. Employees are leaving the organization right and left. The feeling that
> management doesn't care or listen is pervasive throughout the organization... I
> don't believe that an organization can prosper on a basis of secretiveness and
> divisiveness. On numerous occasions you have withheld information from the
> City Council that I felt that they had the right to know. Two of the four incidents
> that were alleged in my recent disciplinary action pertained to the communication
> with them. In addition, you have intentionally pitted employees against each other,
> and then seemed surprised when they don't get along."

In the 2017-2018 fiscal year, under Martin's management, over 30% of the City's employees left

CREIGHTON
& ROSE, PC      ATTORNEYS
               AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

employment with the City, including Senior Groundskeeper Dennis Chavarria (25 years of service), Aquatics Manager Stephanie Frenoch (10 years of service), Mechanic Pat Hill (10 years of service), Dispatcher Jovita Ballentine (8 years of service), and Utility Billing Clerk Briana Lane (4 years of service).

After Nancy Bryant (and later Will Ewing) were terminated, a group of concerned citizens of Toledo launched a recall campaign against Billie Jo Smith. Smith believed that friends of Bryant and Ewing were responsible for the recall election. Smith did not think the recall election was appropriate and felt the recall was "a threat." The recall election addressed the issue of the Columbia Bank Building being bought to use as the police station and meetings that violated public meeting laws. Smith understood that the reason the recall election was put together was that the group wanted Craig Martin fired and the only way they could do it was to get more votes on the City Council. As the mayor, Smith had the power to discipline or recommend terminating Martin to the council if she did not agree with or condone his actions as City Manager. Smith did not do so. Smith was unconcerned that Goldsmith found Martin to be unprofessional and that he acted emotionally towards an employee.

When Ewing was later fired, there was a protest opposing Martin's firing of Ewing. The protestors also set up a booth at the city market. They told Smith at the city market that they wanted Martin fired. They were not physically threatening in any way, yet Toledo police came and stood on either side of Smith. Smith did not tell the police to leave. Bryant was present during this public event. Smith created and distributed a flyer urging people to not sign the recall petition. In it, she tells voters what the recall election is "all about."

"Three former Toledo city employees' want Toledo's City Council to fire City Manager,

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

Craig Martin. Their reason? He held them accountable for their unacceptable behavior and practices.

• The Council hired a neutral investigator to carefully examine the City Manager's actions and to determine the facts in the dispute.

• The investigator reported that the employees claims against Martin were unfounded.

• The investigation revealed behaviors and actions of the now former employees that were unacceptable.

• Accusations against Martin have also been checked by attorneys and our financial advisors. All have been determined to be unfounded.

Why a recall?

• The former employees continue to attack our City Manager.

• These former employees, who have deep roots in our city, have rallied a group of angry supporters through malicious name-calling, unsubstantiated allegations, and misinformation on social media, on their recall petitions, and to the press.

• The group has demonstrated against the City Manager and pressured the Council to fire him."[4]

Smith's flyer essentially called these employees liars and made false accusations about their characters in a very public way. Due to the size of the City of Toledo and the press that occurred after the terminations, those who received the flyers knew that Bryant was one of the former employees referenced therein. Smith also sent out a mailer to all the voters in Toledo prior to the recall election. Smith's mailer called Bryant, Ewing, and Chavarria "three disgruntled former employees" and called their actions "unacceptable and contentious." Smith's mailer accused Bryant of "jeopardizing the working relations in the City," conspiring to "undermine the authority of the City manager," and "continuing their criticism of the City Manager through a legal claim, social media, demonstrations, and in Council meetings. The legal claim was recently denied." (Neither Bryant's claims, nor Ewing's, were ever "denied" by the court.)

---

[4]This is in stark contrast to the letter sent to Olivieri at the end of Goldsmith's investigation, where Smith told Olivieri that the Council determined that Martin should have acted more professionally when interacting with Olivieri.

Creighton & Rose, PC    Attorneys at Law
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

## III. LEGAL ANALYSIS

**A.     First Amendment Claim Against Defendants Martin and Smith**

It is well established that the government cannot abuse its position as an employer to

stifle the First Amendment speech rights its employees would otherwise enjoy as private citizen.

> "A government employer 'cannot condition public employment on a basis that
> infringes the employee's constitutionally protected interest in freedom of
> expression.' *Connick v. Myers*, 461 U.S. at 142. Simply because it is acting as an
> employer, the government does not gain the unfettered ability to interfere with the
> constitutional rights of its employees; that is, it cannot use employment conditions
> to 'produce a result which [it] could not command directly.' *Perry v. Sindermann*,
> 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972) (alteration in original)
> (*quoting Speiser v. Randall*, 357 U.S. 513, 526, 2 L. Ed. 2d 1460, 78 S. Ct. 1332
> (1958)). When a government employee exercises his protected right of free
> expression, the government cannot use the employment relationship as a means to
> retaliate for that expression."*Coszalter v. City of Salem*, 320 F3d 968, 974 (9th Cir
> 2003).

> "In order to state a claim against a government employer for violation of the First
> Amendment, an employee must show (1) that he or she engaged in protected
> speech; (2) that the employer took 'adverse employment action'; and (3) that his
> or her speech was a 'substantial or motivating' factor for the adverse employment
> action." *Id.*

**1. Plaintiff's Protected Speech**

> "The First Amendment 'was fashioned to assure unfettered interchange of ideas
> for the bringing about of political and social changes desired by the people.' *Roth
> v. United States*, 354 U.S. 476, 484 (1957); *New York Times Co. v. Sullivan*, 376
> U.S. 254, 269 (1964). '[Speech] concerning public affairs is more than
> self-expression; it is the essence of self-government.' *Garrison v. Louisiana*, 379
> U.S. 64, 74-75 (1964). Accordingly, the Court has frequently reaffirmed that
> speech on public issues occupies the 'highest rung of the hierarchy of First
> Amendment values,' and is entitled to special protection. *NAACP v. Claiborne
> Hardware Co.*, 458 U.S. 886, 913 (1982); *Carey v. Brown*, 447 U.S. 455, 467
> (1980).*Connick v. Myers*, 461 US 138, 145, 103 S Ct 1684, 1689, 75 LEd2d 708,
> 718-19 (1983)."

CREIGHTON
& ROSE, PC | ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

In this case, Bryant engaged in protected speech when she publicly opposed the creation of the Greater Toledo Pool District and the city's purchase of the Columbia Bank Building, city expenditures that were both endorsed and advocated for by Craig Martin. Further, her communications to the city council and mayor regarding Martin's gender discrimination in the workplace were also protected speech.

### 2. Adverse Employment Action

"An adverse employment action is an action 'reasonably likely to deter employees from engaging in protected activity.' *Coszalter*, 320 F.3d at 976 (citation omitted). An adverse employment action need not be severe, and it need not be of a certain kind. *Id.* at 975. Under this standard, unwarranted investigations, harassment, and reprimands could be adverse employment actions. *See Id.* at 976." *Oster v. Cty. of Solano*, No. 2:12-cv-1264 JAM-KJN, 2012 US Dist LEXIS 146638, at *12 (ED Cal Oct. 10, 2012).

There is no dispute that Bryant's termination is an adverse employment action, but the unwarranted expansion of the investigation of Martin's misconduct to include investigation into Bryant's conduct, the scrutinizing and surveillance of all of her work emails, to as well as the public defamatory remarks about her character, can all be categorized as actions "reasonably likely to deter employees from engaging in protected activity."

### 3. Causation

Defendants have proffered their own alleged reason for the termination of Bryant, that she participated in unprofessional email chains and that she blocked Martin's access to the "recorder assist" file. However, Defendants' proffered reasons for their adverse action are unworthy of credence.

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

**i. Defendant Martin's adverse employment actions toward Bryant prior to the Goldsmith investigation**

Defendant Martin retaliated against Bryant prior to the investigation. Martin reacted to Bryant's opposition to wasteful spending with hostility and anger. Martin treated Bryant disrespectfully and like she was his personal secretary, which caused a heated confrontation. He also began monitoring Bryant extremely closely and taking handwritten notes of her lunch times, dentist's appointments, and greetings to the office after Bryant first complained of his workplace behavior toward women to him, but prior to the investigation. "[S]urveillance strongly suggests the possibility of a search for a pretextual basis for discipline, which in turn suggests that subsequent discipline was for purposes of retaliation." *Yartzoff v. Thomas*, 809 F2d 1371, 1377 (9th Cir 1987), internal citations omitted.

**ii. Defendant Smith's adverse employment actions toward Bryant prior to the Goldsmith investigation**

Defendant Smith told Goldsmith Bryant was "attacking" the City Manager since he became the City Manager, "literally refusing to cooperate on anything he wants to do." She falsely relayed that Michelle Kennedy came in to consult and "felt everyone was willing to work on cooperative except for the City Recorder." Smith essentially poisoned the well and ensured that any investigation that stemmed from Olivieri and Bryant's complaints against Martin would end up targeting Bryant. Smith also gave Goldsmith permission to expand her investigation and gave her access to Bryant's emails, directing Martin to give Goldsmith the emails. Smith turned an investigation into Martin's abusive and hostile behavior into an indictment of Bryant's email etiquette. Because Smith set in motion and influenced a proceeding by an allegedly independent

CREIGHTON & ROSE, PC | ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

decisionmaker that led to Bryant's adverse employment action, her bias can be the basis for liability. See *Poland v. Chertoff*, 494 F3d 1174, 1182-83 (9th Cir 2007); *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001) ("Even if a manager was not the ultimate decisionmaker, that manager's retaliatory motive may be imputed to the company if the manager was involved in the [adverse employment] decision.")

### iii. Defendant Martin's adverse employment actions toward Bryant after the Goldsmith investigation

The actual termination notice given to Bryant cites to the information gleaned from the Goldsmith investigation as being the reason for Bryant's termination. Martin did not contemplate terminating Bryant until Goldsmith's report. Bryant's coworkers who did not lead the complaints against Martin and his policies, but also participated in the email banter, actually calling Martin "dope" and "Squiggy" were not terminated. Defendants now claim that the distinguishing factor between Chavarria, Ewing and Bryant was that Bryant used her position to interfere with the ability to do his job, yet when questioned about it he could not provide any example of how he was prevented from doing his job, admitted that the "recorder assist file," from which he was excluded, mostly contained drafts and duplicate documents, and that Bryant never refused to give him access to any file he wanted that was located in the "recorder assist file." Further, Martin's testimony in his deposition was inconsistent with Defendant's current claim. Martin answered, simply, "Yes" to the question "[I]s it safe to say that the reason that Miss Bryant was terminated is the -- the email exchange with Polly Chavarria and Will Ewing that was uncovered during this investigation?" "When an employer provides shifting, inconsistent reasons for terminating an employee, the differing reasons are themselves evidence of pretext." *Olvera v. Quest*

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

*Diagnostics, Inc.*, No. 20-55957, 2022 U.S. App. LEXIS 1113, at *3 (9th Cir Jan. 14, 2022). (Internal quotations and citations omitted.) Martin's purported reason for termination was pretextual and his real reason for terminating was discrimination and/or retaliation.

### iv. Defendant Smith's adverse employment actions toward Bryant after the Goldsmith investigation

Not only was Smith the puppet master in the investigation that started out as an investigation into Martin's misconduct by providing skewed and biased information to the investigator, Smith condoned and/or ratified the conduct of Martin, both when Bryant came to her with her initial complaint in May of 2017, and when she supported Martin's decision in a very public manner through her recall publications. Smith also engaged in post-employment adverse actions by disseminating flyers to Toledo voters and members of the public, essentially calling Bryant a liar and a "disgruntled former employee."Smith's publications made false accusations about Bryant's character in a very public way, "jeopardizing the working relations in the City," conspiring to "undermine the authority of the City manager," and falsely claiming that her legal claim was denied, implying that she was bringing frivolous claims against the City. Smith explicitly characterizes Bryant's 1st Amendment protected right to redress her grievances as "continuing [her] criticism of the City Manager through a legal claim." Smith's public comments against Bryant were reasonably likely to deter employees from engaging in protected activity and stemmed from Bryant's protected activities.

### B.    Equal Protection Claim Against Defendant Martin

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

CREIGHTON
& ROSE, PC | ATTORNEYS
AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 72 L. Ed. 2d 786, 102 S. Ct. 2382 (1982)).

> "To show intentional discrimination, a plaintiff need not prove that the challenged action rested solely on [...] discriminatory motives, or even that a discriminatory purpose was the dominant or primary one. Rather, the plaintiff need only prove that a discriminatory purpose has been a motivating factor in the challenged action. To raise an inference of discriminatory purpose, a plaintiff may allege direct evidence of discriminatory intent (e.g., racist statements), that he was treated in a manner inconsistent with others similarly situated, or other facts that raise an inference of discriminatory purpose."*Hamilton v. Tigard Police Dep't*, No. 3:24-cv-00895-AR, 2025 US Dist LEXIS 55113, at *7 (D Or Feb. 7, 2025) (internal citations and quotations omitted.).

Bryant's gender was a substantial motivating factor in Martin's termination decision. First, Martin treated her with hostility and negativity, criticizing everything she did. Martin did not treat Bryant in a respectful manner, was condescending to her and made back-handed comments about her. He demeaned Bryant by telling her she was not a department head. Martin expected Bryant to serve in a role that catered to him, opening his mail and providing him with other secretarial services. Viewing women as belonging in traditionally female-dominated roles such as secretary and describing them as "difficult," "problematic," or not a "team player" can be forms of sex stereotyping. See *Bureau of Labor & Indus. v. Roseburg*, 75 Or App 306, 313, 706 P2d 956, 961 (1985); *Stegall v. Citadel Broad. Co.*, 350 F3d 1061, 1072 (9th Cir 2003). Witnesses did not see him treat male employees in a similar manner. Further, a man who engaged in the same behavior as Bryant was not terminated. William Ewing was not terminated in November for the emails he sent that were disrespectful to Martin.

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

**C. State Law Sex Discrimination Claim Against All Defendants**

**1. Hostile Work Environment Claim**

The Oregon anti-discrimination statute, like Title VII of the 1964 Civil Rights Act,

forbids the creation of a hostile work environment based on a protected characteristic. *Holien v.*

*Sears, Roebuck & Co.,* 298 Or. 76, 88 (1984). Oregon standards regarding hostile environment

claims generally rely on federal decisions interpreting Title VII. *Garcez v. Freightliner Corp.,*

188 Or.App. 397, 410 (Or. Ct. App. 2003). Hostile environment claims arising out of gender-

based conduct are often referred to as sexual harassment cases, but that terminology is to some

extent misleading; the gender-based action giving rise of a hostile work environment need not be

based on sexual desire. *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998).

Hostile environment claims are in some respects unlike other violations of anti-

discrimination laws. As the term "environment" suggests, the violation consists of the hostile

atmosphere at a workplace, one that has been created by earlier incidents of harassment or other

discriminatory conduct.[5] A hostile environment is usually the cumulative result of a series of

prior acts, although a particularly extreme act could create a hostile environment.

A hostile work environment claim has both a subjective and an objective element. First,

the plaintiff must show that he or she personally perceived the work environment as hostile.

Second, the plaintiff must establish that a reasonable person in the position of the plaintiff would

regard the environment as hostile. *Dominguez-Curry v. Nevada Transp. Dept.,* 424 F.3d 1027,

1034 (9th Cir. 2005). To meet this second element, a plaintiff must show that the harassment

---

[5] In some circumstances, abusive action might support a hostile environment claim
because, by its very nature, it affected men and women differently. *Elison v. Brady,* 924 F.2d
872, 878 (9th Cir. 1991).

CREIGHTON
& ROSE, PC | ATTORNEYS
AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

and/or other discrimination was sufficiently pervasive or severe that a reasonable person could conclude that the resulting environment was hostile. *Reynaga v. Roseburg Forest Products,* 847 F.3d 768, 686 (9th Cir. 2017).

In this case, Plaintiff was belittled and demeaned by Martin, treated by Martin as his personal secretary despite her department head status, and was told she was not a department head by Martin. Other female employees also noticed Martin's gendered treatment of Bryant. When Bryant reported this treatment to Smith, she was disbelieved and an investigation was not done into her complaints. This is all evidence of a hostile work environment.

### D. State Law Whistleblowing Claim

Oregon state law prevents retaliation against public employees who speak out against "[m]ismanagement, gross waste of funds or abuse of authority." When Bryant publicly opposed the expenditures of public funds for the Greater Toledo Pool Area and the purchase of the Columbia Bank Building, and publicly criticized Craig Martin's management, she was engaging in protected activity under ORS 659A.203(1)(b)(B), and was unlawfully retaliated against and terminated in response to these complaints.

## IV. DAMAGES

The majority of Bryant's damages in this case are related to her termination from her employment and the emotional distress of being subjected to discrimination. Evidence will be presented about the extent of her wage and benefit loss (over $500,000) and emotional distress and how that has affected her life while working for the City of Toledo and the years since her termination.

/ / /

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com

## V. CONCLUSION

In sum, the evidence to be adduced at trial will allow a reasonable jury to find, and to return a verdict in favor of Plaintiff on her claims.

DATED this 14ᵗʰ day of May, 2025.          CREIGHTON & ROSE, PC


  _s/ Beth Creighton_
Beth Creighton, OSB 972440
E-mail: _beth@civilrightspdx.com_
KRISTIN BELL, OSB #235024
E-mail: kristin@civilrightspdx.com
Of Attorneys for Plaintiff

CREIGHTON
& ROSE, PC     ATTORNEYS
                AT LAW
735 SW First Ave., #300
Portland, OR 97204-3316
T. (503) 221-1792
F. (503) 223-1516
beth@civilrightspdx.com